In our second case today, we have number 24, 1383, Hebb v. City of Asheville. Mr. Edgerton? Yes, sir. You're here for the city? Yes, sir. Good to have you, sir. Good morning, honorable judges, and may it please the court, my name is Eric Edgerton. I'm a senior assistant city attorney for the city of Asheville, North Carolina, the appellant in this matter. And in what's probably a proposition for any attorney, I'd like to start with some math. Specifically, I want to talk about two numbers that I think are relevant to our consideration today. The first of which being 40. 40 is the number of times that the parties in this matter cited to the case of Medlin v. Palmer in their briefing to the district court. Now, Medlin v. Palmer is a 1989 decision of the Fifth Circuit, and if your initial reaction is to wonder why such a majority of the party's briefing would focus on that case, the explanation is simply that the facts are virtually identical to those at issue in this case. It involved a municipal regulation on the use of amplified sound within 150 feet of a medical clinic during those hours in which it is open and operational. That's precisely what the ordinance at issue in this case, section 10-85-2 of the city code does. The claims presented in Medlin v. Palmer were also the same as the incident case. The First Amendment challenged that ordinance's validity, as well as a due process clause challenged that ordinance's validity. That identicality of issues explains why the parties would have spent more time briefing the case of Medlin v. Palmer than any other to the district court. The second number I want to mention is zero. Zero is the number of times the district court cited to or otherwise acknowledged the existence of the decision of the Fifth Circuit in Medlin v. Palmer. But that also should not be surprising given the procedural posture we're in. Also not surprising because it has no precedential value here. Yes, and I only look for it for God. And thank you, Judge. 1989, and he just might have decided, he decided. And thank you, Judge. That delivers me directly to where I was going to wrap up my initial opening, which is to say that the bigger problem is not that failure to acknowledge the existence of this Fifth Circuit precedent, even if the facts are identical. The bigger problem is that every legal principle acknowledged by the Fifth Circuit on each of the three prongs of the First Amendment test and on the issue of the due process clause are 100 percent the same as the principles that this court has acknowledged in its own precedents. And so for that reason, I don't intend, Judge Winn, to use this 1989 case as some sort of shorthand or cudgel to say, well, the Fifth Circuit did this, you have to do the same thing. Rather, I'll use it as a roadmap to go through each of those prongs and direct this court back to exactly where you've endorsed the self-same legal principles that led at least one other federal circuit to conclude that a municipal regulation on the use of amplified sound within 150 feet of a medical clinic during the hours in which it is open and operational to be obviously constitutional. And with that, I'll move into the first prong of the First Amendment standard. This is going to take the least amount of time. This is the substantial government interest question. I believe this is largely resolved. The district court at page 371 through 373 of the Joint Appendix essentially recognized that this standard should be satisfied or should be found to be satisfied. The district court did, and I'm just trying to figure out how we look at that. There's certainly precedent that talks about the concept of the interest the state has in medical patients having an environment that allows them to recover. So in that sense, maybe that concept is not in controversy. But there is controversy about whether that particular interest was really what was being, was the reason behind the ordinance. I mean, the district court cited facts. You might disagree with those facts, but they were that, you know, that these things originated about there were record, in the record, there were complaints about music, that there weren't any complaints from any other medical providers. There weren't any complaints about schools. There had been, you know, some communication about the clinic with the city. But to the district court, that, those facts were important and said maybe this interest is there, but the district court's review of it was that the record showed that that interest may not have been the actual one advanced. Yes, Your Honor, and I think that we can resolve this issue of how do you reconcile the substantial governmental interest prong with the district court's analysis in the regards that you're talking about. That's the over-inclusion or under-inclusion analysis that the district court went through. That's a separate issue. I mean, the first issue, I think, is do you get to claim a, in general, an acceptable interest if the record shows that wasn't, calls into question whether that was actually the city's interest? Yes. So, my answer would be directly that that's the standard that this court has set forth is that if you have established in the past that this is a compelling government interest or a substantial government interest, rather, that you can rest on that, that that would essentially settle the issue. So you can, you can say an interest that is generally acceptable and if the record would show that's not what you were really interested in, you get to just say, well, yeah, y'all have already said this is okay, so I'm good? No, Your Honor, because those facts can then still be presented in the narrow tailoring argument. Okay, so that's, that's just in a different part of the analysis. Exactly, Your Honor. I gotcha. I'm sorry. I jumped ahead. No, no. And that's our next stop. So, unless there are any further questions on substantial government interest, I'll move straight into the narrow tailoring. And so, when I say that this Fifth Circuit case set out the same exact standards that you all have endorsed, I mean that quite literally. And so, this court in Ross v. Early has set out the standard in stating that municipalities need not, and I'm quoting, quote, regulate using the least restrictive or least intrusive means available to achieve its goals. Put differently, so long as the means chosen are not substantially broader than the necessary, than necessary to achieve the government's interest, the regulation will not be invalid simply because the court concludes government's interest would be adequately served by some less speech-restrictive alternative, end quote. That's the standard. It's not a standard of infallibility. And so, when we have a record before us, we know what the city did to tailor this ordinance. We know that it specifically restricted the application by distance. 150 feet is all where it exists. It restricted it by hours of operation. And so, it's not in effect when clinics are closed. That has been found by multiple other federal circuits and district courts within this circuit to be a sufficient level of narrow tailoring to survive First Amendment scrutiny. Do the facts about the citations to the plaintiff here before the ordinance was in place, is that relevant at all? I mean, he was cited, it seems like, by the city's own acknowledgement improperly the first time. And then Mr. Woody, who is normally not the person who issues citations, comes and cites him two other times about an ordinance that doesn't even exist yet. Does that bear on anything here? Just to clarify on the factual basis, I don't believe Mr. Woody's engagements with the plaintiff constituted citations. I think they were actual just direct communications by email. No citation was issued, but he did say, I took these readings and I wanted to let you know what they showed. Well, maybe I'm in weeds that don't matter. So sometimes that happens with me. So I'm sorry if that's the... I thought he was cited one time, not by Mr. Woody, but by someone else. He brought to Mr. Woody's attention the fact that he was cited and Mr. Woody said, yeah, what you're doing is not improper under the current ordinance. And that kind of got it dismissed, basically. And then later, I thought, maybe I'm wrong here, that Mr. Woody himself carried out and handed some sort of citation around the time, but before the new ordinance went into effect. Am I wrong about that? On the latter instance, that doesn't strike me as probable and I don't have a clear recollection of that being in the record. That would not be within Mr. Woody's normal job function whatsoever. And so that... What was Mr. Woody's title? He's currently the Assistant City Manager. He was the Director of Development Services at the time. He was sued here. I don't know what they... Yes. But he's the Assistant City Manager. He's the Assistant City Manager now. At the time of these proceedings, he was a Development Services Director. He was probably... Development Services Director. That's the relevant title. Right. And so he was probably the primary city employee involved in the drafting of this ordinance and the development of it. So that would be his involvement. But to answer Your Honor's question, Judge Pottabom's question about the initial citation, I think it is instructive. I think it is relevant because that gets to what initial problem the city was looking at as it embarked on this initiative to revise and reform its noise ordinance. It had this just purely subjective standard in place that was extraordinarily difficult to enforce. It was not resulting in corrections to the types of behavior that you want to discourage with a noise ordinance. The record shows that there were, and I'm at page 56, that there were numerous complaints continuing to be received from this immediate area of the City of Asheville's Medical District. And so that... You're talking about like there are all these complaints from all these medical providers. What's the evidence of complaints from medical providers other than AHC? Yes. I appreciate that question, and I don't believe there are any other complaints other than from in this immediate area. So that's fine. They're a citizen, and they're entitled to make complaints, but the notion that the medical community in general is complaining about this just isn't supported by the record. It's a particular clinic's complaints. Yes. I think that's fair. And then I would refer the Court to what the Supreme Court has said in McCullen v. Coakley on this issue, because it dealt specifically with it. It said the government's, quote, adopt laws to address the problems that confront them. The First Amendment does not require states to regulate for problems that don't exist. If there happens to be a specific group of people who violate one law or one ordinance more than others, that does not give rise to a First Amendment claim. It just shows that they are more prolific in violating the law at issue. If the law remains content neutral on its face, it is subject to the same First Amendment analyses as any other ordinance would be. To this point, the... Maybe not anomaly, but it seems if we hold this ordinance as content neutral here, yet an individual chooses to express a viewpoint-type message, and it affects a particular group or particular clinic, the question then becomes, does that change it from, at least the purpose of the ordinance that we've held to be content neutral, does that mean it then is a viewpoint? No. It has to be balanced against that quoted principle that I just referenced from the Supreme Court, which is that you adopt laws to address problems. So yes, if you have evidence that it was targeted at some specific individual, if it amounted to something like a bill of attainder, that could be a problem. But you don't jump there. You don't assume that malicious intent. That's also... To do so would be inconsistent with the deference that is typically given to municipalities and their legislative decision-making. Go ahead and finish Mr. Twain's question. I'm sorry. Yes, Your Honor. On the specific question of how that plays out in this context, I would analyze or analogize to 18 U.S.C. 248, which prohibits certain forms of speech or conduct in the immediate area of the entrances to reproductive health clinics. In discussing that law, I believe it was that law, the Second Circuit stated, quote, it is irrelevant whether in practice most of those prosecuted under a law are anti-abortion protesters. First Amendment law does not recognize disparate impact claims, and a group cannot obtain constitutional immunity from prosecution by violating a statute more frequently than any other group. And so when the behavior at issue is anomalous and limited to a small subset, yes, they can claim that they were being targeted. But on the facts available before this Court, it is demonstrated that most of the complaints had no references whatsoever to the content of the messages, but were focused on the fact of amplification. That's at page 348 of the Joint Appendix. I'm sorry. Judge Quaddabom, I think I... No, no. You go ahead. I just, I mean, I'm not, I don't want to belabor it, but I've looked at the complaint and the complaint does allege that Mr. Woody cited the plaintiff twice in July of 21 before the ordinance went into effect. And so, I mean, that's what the allegations are. I mean, and we're talking about, we got to accept those as true at this stage of the case. Thank you. I'm sorry. And if that bears on the First Amendment analysis, I'll be happy to revisit it, but... I hear you. Maybe it does. Maybe it doesn't. And so, that's the narrow tailoring prong. Can I ask a question? You're running out of time, and I'm probably partly to blame for that, but can you point us to any, a JA site where the city considered a less intrusive ordinance to the speech that the plaintiff sought here, or then was contained in the ordinance? Yes, Your Honor, and so there's the background information on what the reality was when the city was operating under just that subjective standard, that noise disturbance standard that I mentioned. And so, with the record of receiving all those, that body of complaints under that former standard is at page JA-56, the district court actually concluded that that was what was going on. So, those are, just to help me out, those are complaints from the clinic? Those are complaints from the medical district from that area, and if Your Honor is pointing out that they're almost exclusively, if not exclusively, from this one clinic, I'd accept that as so. But that's the body of complaints that demonstrates that that's purely subjective standard was not functioning as it should. With respect to the other... Does the fact that no other medical providers in this medical district complain suggest the opposite? Well, I will tell you that some of the complaints, and I believe they're included in the Joint Appendix, were from other medical providers about the same individual, but those are medical providers that adjoin or are nearby the clinic that Your Honor... So, they're not from the clinic itself? No. I can conclusively say that 100% of the complaints did not come from the clinic. Their surrounding community, as well, have this... What else is out there in the medical district? It is as you would think of any medical district. It's a concentration. There's a central hospital, and then in the radii going out from that, there's... Nurses? Dentists? Anything. There's... And a hospital. The main hospital of Asheville? Yes, Your Honor. Mission Hospital. Yes. And then... Aside from the complaints, what is there that there was actual consideration of less intrusive means and why those didn't work? Yes, Your Honor. And I'll address this when I come back up. Just to preview, I'll tell you that it's the... That we considered the decibel, the use of decibel limitations, and then the consideration for why that would not be sufficient appears at JA 114, 115. Is that the Woody affidavit? Yes, Your Honor. Okay. And then the... Just to make sure that I cover all these while I'm still up here on my initial statement, the ample alternative means of communication, I believe, is going to be equally clear-cut. This court has said also in Roski earlier that the alternative channels need not be the speaker's first or best choice or provide the same audience for the impact of speech. It simply has to... The relevant inquiry is simply whether the challenge ordinance, challenge regulation provides avenues for the more general dissemination of a message. In our briefing, we provide you with the decisions of two other federal circuit courts that say restrictions on amplification obviously still allow alternative means of communication. On the due process issue, we've explained in our briefing why it should have been subject to a deferential standard. There's a default assumption in favor of constitutionality that the district court seems to have ignored when it was trying to interpret whether the term amplified sound was something that normal adult human beings could understand. I think we can all reflect on that as such adults ourselves. The additional canons of construction that the district court disregarded include those that require that when a general term is used, you assume it actually meant the general term. The district court erred here by assuming that when the city said you can't use amplified sound, it must have really meant you can't use either mechanically or non-mechanically amplified sound and determined that there was an ambiguity on that basis. When the city says amplified sound, you should assume that it meant amplified sound. To go back to Medlin v. Palmer, that court, the Fifth Circuit, analyzed the exact same issue and found that there was no basis to find a due process violation. I'll revisit in greater detail the decibel issue when I come back up, Judge Quattlebaum, but for now I'll stop. Thank you, Mr. Ager. Mr. Kellum. Good morning, and may it please the court. My name is Nate Kellum. I represent the plaintiff, I believe, Zachary Hebb. At the core, this case is really about the right to be heard. Mr. Hebb has a fundamental right to free speech, and that encompasses a right to be heard, and Asheville's ordinance infringes on this fundamental right. The ordinance is not narrowly tailored to a significant government interest. It goes far beyond any legitimate interest in trying to curb excessive noise because it eliminates all use of amplifying devices or plastic cones within any reasonable distance of this particular clinic. If he was, if your client was 150 feet away and had his iPhone and it was on speakerphone turned up high, would that be amplified sound? Even without being, it would. Even without being particularly loud or high because it's not dependent on the loudness. It's just dependent on the device, which could be an iPhone. It certainly could. And so, and because it does depend on the device and not really the sound level, that's where this ordinance goes constitutionally awry. The overreach is particularly troubling for Mr. Hebb because he doesn't wish to speak loudly. He wants to speak in a conversational tone. That's really the only way he can be effective when he's trying to reach individuals as they're trying to. Well, I've never heard anyone speak conversationally with a cone. I mean, so, I mean, I hear conversations great, but does saying, I mean, maybe, maybe he's going, that just, those two things, saying you want to be heard and use a cone, yeah, I get a lot of the arguments. That seems odd to me. I mean, if someone wanted to talk to me and was doing it with a cone, I would think you don't really, aren't trying to have a conversation with him. Primarily that would be with the amplifying device. Like I'm using a microphone here where I'm trying to speak conversationally. I don't think it'd be very effective with the panel for me to yell from the microphone. What do you mean by a cone? Something, like how big is it? Like a cheer cone. Well, it's two feet, three feet, one foot? He's used different types of cones and that's not in the record, Judge King, but basically it's a plastic cone. What do you mean? You used the term right there. Sure. It's like a one foot, one and a half foot cone where it's plastic. Where it basically has a small circle.  You say that doesn't amplify the sound. It directs it. Is what it does. It directs it. Yes. It doesn't amplify it, it directs it. It directs it. And it makes it... And where does he direct it toward? Oh, it directs it toward the people he wants to hear his message. And that were the people going into this clinic? Yes, Judge. That's right. He never alleged in his complaint that he wanted to use a cone. He did it in a preliminary injunction motion, but it's not in his complaint. That's not his primary thing, but he has put it in his affidavit and I thought it was in his complaint. But he definitely wants to use a cone if an amplifier is not available. He doesn't make any bones about it, Judge Winn. The basis is that his friend wanted to use a cone. His friend? No, that's where he... That's how he learned about it, Judge Winn. When his friend...  So, isn't that a standing issue? I don't believe so because he wants to go out there with a plastic cone. That's what the evidence is. Well, at least when you want the child to avoid forbadeness. That's right. You try to be specific on it. You didn't put it in your complaint. I believe it's specific enough, Judge, because he says that he wants to use a plastic cone as far as that was put in the preliminary injunction, it's put also in the summary judgment in his affidavit that he wants to use a plastic cone. But then you put it in the allegations that brings the matter to bear. It's not in the complaint. Judge Winn, the complaint... And it's not something that you've indicated to Judge Qualbon. It's certainly not something that you would expect he's going to get up and use his regular voice. He's not going to do that. I guess a cone sort of works because you raise your voice and it has a way of projecting it even louder. Maybe a regular voice, somewhat louder, but it's not going to be enough to probably satisfy what he wants to do. I mean, he can yell. It definitely interferes. He can yell. He can have signs. He can do all kinds of stuff. But what he wants to do is he wants to have an ability to talk, something that projects his voice loud so he can project it further or so it can be heard in a different way. I would say both, but primarily that it could be heard in a different way. So it could be heard in a conversation way as I'm speaking to you, Judge Winn. That's what's in a record. That's what's effective for him to be able to... Because he wants to talk to him, talk about, hey, we have other options. We have other things you could consider. And so he really wants to start a conversation. Do you agree that ordinance is content neutral? It doesn't mention anything specific here in terms of viewpoints. It's focused on particular locations. So I think under current Supreme Court holdings, it is content neutral. That really wasn't the argument. So immediate scrutiny is what we're applying here. I'm sorry, what's that, Judge Winn? Immediate scrutiny. Yeah, it's immediate scrutiny. And whether is it narrowly tailored, and as a question was raised about, does it advance a significant government interest, which it falls short in that as well, because while I think excessive noise, curbing excessive noise can be recognized as a legitimate interest. So he's allowed to communicate, he's allowed to have speech, but it's the manner in which he wants to communicate. Is Asheville required to honor the manner in which he wants to communicate? That's what the court held in McClellan v. Copeland, where it talked about the significant burden imposed on conversational speech. What do you do about the law? Your colleague cited that you don't necessarily get your preferred manner of communication. There are cases that state that. What's your response to that principle? Certainly. And that goes to the third problem, which is does it leave open ample alternative channels of communication? And so that's really separate from the narrow tailoring. But as far as leaving open ample alternative channels of communication, that's an issue as well, because yes, while there certainly are cases that state that it can't be necessarily the best or preferred, it is recognized it has to be adequate. It has to be something that fulfills what your mission is, why are you out there? And I think McClellan v. Copeland is really spot on with this, because it speaks to the ability to be able to have these type of conversations that's really not good enough to be able to yell at somebody, because that's not how they want to be able to fulfill their mission. Their mission is to be able to create a relationship, to be able to start a conversation, and you simply can't do that by yelling. Our case, I think it's pronounced Pomerleau? Yes. A helpful case to you. It talks about the benefit of amplified communication and looks and says that if amplification is not really much different than a normal person communicating louder than normal, that's a type of speech that is, in that case, protected, and an ordinance that prohibited that was not. So I guess I'm a little trying to figure out exactly where you're going. I hear the thing about conversational, but it seems like he needs, the reason he's using the cone is he wants to be heard, and he knows that if he's just talking, presumably he won't be heard. So, yeah. Well, that's certainly right in this case, because he does need to be heard, and he would prefer to be able to speak in a conversational tone as I'm speaking. But at the bottom line, he needs to be heard to some degree. And what you have here is that you have a buffer zone that goes to 150 feet. So the buffer zone means that he has to amplify and use the cone. Well, not the way the buffer zone... Because he can't get by with the normal conversation, because he's too far away. He's too far away because within just the 150 feet. So he has to amplify. So the buffer zone requires him to amplify to do what he wants. Well, being private property and on a public sidewalk, to a certain extent requires him to amplify as far as what he wants to do, because you have people that park in the parking lot. They're walking toward the building. So he wants to be able to use amplification. The 150 feet... He wants to amplify for the patients walking from the parking lot to the clinic. That's right, Jeff. How far are they walking? 50, 60 feet? That's about 50, 60 feet. 50? 50, 60 feet. You're right. 50, 60 feet. It's not much time, really. And so he's trying to get a conversation... He wants to be heard. He wants to be heard. So he wants to be loud. Loud enough. Because there's a buffer zone. Loud enough. Well, not because... I mean, he wanted to do that regardless of the buffer zone, because he's on a public sidewalk, and he's trying to speak on people on private property in the parking lot. But with the buffer zone, he can't speak on the public sidewalk. But I don't think the... You know, it would cause a lot of trouble.   But I'm thinking of an instance, like, if you had a clinic, let's say, that did transplants of hearts. And there were people who were against this whole deal that you shouldn't be taking another human's heart. I mean, where do we draw that line, that you can stand and yell, you can talk, okay, that's fine. That's your speech. But to the extent that you can amplify it to whatever degree, and then individuals in there have to... They have... They're being forced to listen. So the question is, where does it get that line where the speech is not just speech, it is also forcing it to be heard? Where if you have individuals... You know, you do have people who don't want to hear. And I know that doesn't factor too much into the First Amendment, but the First Amendment says you can speak. And so then when you reached in this intermediate scrutiny test here that you're dealing with, and there are other cases that dealt with... The Medellin case was one. It was 1989. There was a bunch of other cases. Judge Flanagan's got a case down in the Eastern District of North Carolina that sort of cut against the two. And the question then becomes, we want to be sensitive and say, we want you to speak because First Amendment stuff is like privacy. I mean, speech is big stuff. But then what is the limitations of a city in protecting its citizens, or in this case, people who are undergoing surgery? And it's not transplant surgery, but you could well see. I believe there probably is a group of people out there that do not like the fact that you take human hearts from a person and put it on another one. They think that probably violates something. And it probably wouldn't be very comfortable to someone who's receiving it, nor their family, to have someone outside that building constantly yelling, you can't take this person's heart, and that sort of thing. And the question is, where is the cutoff? And what's been allowed here is some sensitivity. You can speak. You can yell. You can put up signs. You probably can. Maybe the comb. I don't know. Maybe the comb could be violative of it. But your client doesn't know because he's not done that. So, I mean, where do we go with this? I mean, there's some sensibility here and sensitivity. And it's not addressing the viewpoint. You're entitled to express your viewpoint. The question is, to what extent must your want and the manner in which you want to do it be addressed? And could it be, in terms of what, is it your subjective desire or what you want to achieve, or is it the objective aims of the First Amendment speech basis? It's objective aims of the First Amendment, and that's why decibel levels are the way to go. Because you have a decibel level in a commercial area, which this clinic is located at, 65 decibels. He was complying by that. And if you're complying by that, you can't hear it in the center. There's no complaints of ever hearing it inside the center. And so that's why you use the decibel level. That's the way you're judging sound that way. If a person puts up soundproof walls, does that violate his First Amendment because now he's not allowed to be heard? Not at all. It wouldn't. Do they have soundproof walls up? I don't know that they do, but quite possibly. But if he's yelling, then you have no argument here today, you're saying. No, I'm not saying that. What I'm saying is, is that he could be yelling at the top of his lungs, and he could possibly be heard inside the clinic because he would be much louder. Can it be heard when the people are going in the clinic? In other words, he wants to communicate with a particular group of people. Can he communicate with them? He wants to communicate while they're in the clinic. No, he wants to communicate while they're walking. He just wants to communicate while they're walking at 60 feet? Yes, Your Honor. But they're walking from somewhere. They're going from their cars to the building. Why don't you point the parking lot? It's a private parking lot. He can't park in there. All he can do is be on the public side. So he can't get close enough to project his voice to the parking lot. And the parking lot is so close to the building, there's no chance for him to do it. It's like going in a tunnel there. It's not quite like a tunnel, but you're talking about a distance. That's where an amplifying device is. Those you want to talk to are young women. Or families. Generally, they're family, and they're families. They're families. And young women in sensitive situations. Right, which is recognized as constitutional, is being able to do that. The question is, is really. No, but I'm asking you, they are. They're usually young women in sensitive situations that he's willing to talk to. That's not in the record as far as what that is. But I think that's recognized that you have young women. You could have older women. You're having someone who's looking into getting an abortion. And then you have there some other folks who are interested in it as well. And sometimes they're being compelled to do it. And so they're trying to address those individuals. Sorry to cut you off there. First of all, I think just, as I understand, I looked at the complaint in paragraph 105. It said Smith gave the amplifier back to Hebb, and he proceeded to use it, sharing his views about visitors. I think that's the allegation you're talking about where Mr. Hebb is using that cone. Is that right? Yeah. Sometimes he's not always using an amplifier. Sometimes he does use a plastic cone. Is amplifier something other than a cone when you're using it there? Or is that like a mechanical amplifier? It could be either. In that particular situation, I think it was using a plastic cone, but I'm not certain about that. Okay. All right. But what I will say is that he uses different devices. And also with the, what was required for the city here, is that they have to show that they have explored other ways. That's what I was about to ask you. Less intrusive speech ways. You heard your colleague say he gave me a cite to, I think, the affidavit of Mr. Woody and the complaints at JA-56. So he's going to say that is the evidence that they did that. What's your response to that? Yeah, that's all they have. And that's what this court referred to in Billups v. City of Charleston as a post hoc justification. There's really no evidence at all that they considered other options before deciding to go with this flat band or that they just determined that it wouldn't work. So what should they have done in your view? They had this study that went on for like two to three years of noise, and this issue really never came up. It just never came up. But had it come up, then they would say, okay, are our current laws, are they working? And it would seem like they were because actually there were citations that were issued to Mr. Hebb. Why isn't it enough to say that people connected in some way with the clinic there complained? There was at the time a decimal level. Why isn't that effectively considering a decimal level, which is a different alternative? You have a citizen complaining about things that are going on outside their facility, but there's no showing that they considered it and said, okay, just because you have a complaint. And really also I think that's just not sufficient because you have to actually take a look at the legitimacy of the complaint. How can we best address it if it is legitimate? Are our decimal levels, are they working? Also, we have a multifactorial noise on this. Is that working? And so those are the type of things that they could and really should have looked at here. Should they have looked at 100 feet versus 150 feet or things of that nature? I think anything where you just completely shut down a device that was recognized in the Pomerleau case, was recognized in, say, versus New York as an indispensable instrument for speech, I think it's going to be dubious from the start. So really it would seem like instead of dealing indirectly with devices, why don't you deal with the sound level? What sound level is appropriate? Maybe you determine that outside of medical clinics, outside of public schools, we need to have a lower decibel level as opposed to a higher. Maybe that's the way to go about it. But at least then you're dealing with something that's more direct, which you purport to be the actual issue, and that is excessive noise. And that's something that's just simply not done here. Because what happened, this was the last second edition, which had nothing to do with everything that led before the noise ordinance. And so I'm out of time. So if you have any other questions, I will sit down. Thank you. Thank you very much, sir. Mr. Egerton. Yes, Your Honor, so I will just follow up. I know I promised I would come back to the decibel levels. But just because I think this is a quick one-off, I'll just point you to one further clarification that I think is necessary based on the substance of my friend's argument regarding the ample alternative means of communication. Judge Winn, you hit on the issue that this circuit does not recognize an inherent right to be heard by whomever you want to hear you, wherever those persons may be. That's a correct assessment of the law under Roski early. The briefing for the athlete in this matter doesn't attempt to contradict that. What they do instead is they cite to a Seventh Circuit case called Weinberg v. City of Chicago, in which the Seventh Circuit said, yes, you have a right to have these people hear you. And that's not typical of really any other federal circuit. I'll tell you, the Seventh Circuit also immediately thereafter, there's a scathing dissent in the petition for rehearing en banc in Weinberg because at least four members of the Seventh Circuit recognized at that time that that was wrong. The Seventh Circuit re-referenced the decision in Weinberg in 2016 in a case called Left Field Media, LLC, and deliberately chose not to re-endorse that standard. And so they don't present you with any Fourth Circuit argument saying that they have a right to be heard by who they want to be heard by because that's not the standard. What they do is instead pivot to what seems to be dubious law from the Seventh Circuit. But to return to Judge Quattlebaum's question about the decibel levels, there's been this sentiment suggested that this is an ad hoc or pretextual explanation that the city didn't really consider the decibel levels or that its reason for not using decibel levels in this particular area, which is a public right-of-way, is not sensible or is not a real concern. So two things on that. I've given you the joint appendix citation for where the affidavit of Mr. Woody explains what they were specifically looking at, the enforcement concerns that they had that led them. You gave me page 56? No, I'm on 114 and 115. That's the explanation of why a decibel standard would not be sufficient. Noise in rights-of-way tends to be transitory in nature. It's not like going to set the property where noise is emanating from and you can measure from the property line. The transitory nature of noise within a right-of-way or other public space is what makes that a distinction. And, Your Honor, I see the questioning. Look, that's not just Mr. Woody's interpretation. That's not just the city's interpretation. This circuit has recognized and, in fact, did so in the Palmer low case that that's an exactly correct concern to have about enforceability. And so I'll read from that case where this court said, quote, Baltimore's ordinance as applied to the amplification of political speech on a public street does not meet these tests. The evidence discloses that in commercial areas, the Bureau of Noise Control cannot follow the ordinance's directive to measure decibels on the property line of use. Instead, its investigators measure volumes from points where they have observed pedestrians or expect them to be. The speaker is thus penalized unless he is able to correctly guess where the investigator will take a measurement. Because a violation depends on the subjective opinion of the investigator, the speaker has no protection against arbitrary and capricious enforcement of the ordinance. And so that's this court in 1977 explaining exactly why a decibel level in a right-of-way is an improper and problematic method of enforcement. The city worked through that concern up front and came up with an alternative means of regulation, which is now before this court in Section 10-85, the ordinance. The final thought that I will leave you all with is to just return to the fact that we do have a case on all fours from another federal circuit. We've been talking about this court's actual precedent as we've worked through each of the prongs, but I do want to regroup by just pointing out that the Fifth Circuit looked at a municipal regulation on the use of amplified sound within 150 feet of a medical clinic during the hours in which it is open and operational, exactly what this ordinance does, and determined that it was not even a close call. The language used by the Fifth Circuit is phrased in terms of obviousness, that there was clearly no constitutional violation. And so I'll just close with the words from a 2023 opinion of this court, which was, it was in a matter of the Brooks v. Kaji, Kaji, where this court said, put simply, the Cody decision is practically on all fours, and there's no reason for us to reach a different conclusion and thus create a circuit split. Now, Judge King, those words were, are as correct now as they were when you wrote them back in 2023. You have a case on all fours. There is no reason to create a circuit split. Was that a holding or just an observation? Sorry, Your Honor. What I was saying, was that a ruling or an observation? I may have been musing or something. That was part of the analysis, that where there is a case on all fours, and it seems fairly sensible. Judge, I take very seriously anything Judge King says, because he's always right. But just, and I think we should, and I'm sure what, you know, what that case says is we should carefully consider, you know, what other circuits do. We learn from them. And we shouldn't lightly create a circuit split, but we, I think Judge Wynn mentioned this earlier, and I think it's pretty clear that we're certainly not bound by this circuit's 1989 case. And if we think this case is appropriate based under the standard review, whatever, I mean, I don't think you're suggesting we should say, well, we just got to go with what they did in that case. That's what I told the court up front. I'm not going to use this as a cudgel. I'm saying we've gone through every single principle on top of that. I just happen to think Judge King was correct when he say that if there's a case on all fours. Like I said, Judge King's always correct. And on that point of unanimity, I'll say it. You didn't mention the Pine case, which is a level circuit case, points in that direction too, but you don't have to. Your Honor, I'm trying to be as charitable as possible. We have an ordinance that's 150 feet. Pine was 100, and because Medlin is 150, I'm going to be as honest with you as possible. I'm saying it's at least a one circuit split. Well, at least one circuit is different, but you're correct. I think it's probably two under the rationale expressed in Pine. We appreciate counsel's assistance this morning. Good arguments. We're going to come down and greet counsel as we do as a tradition of the Fourth Circuit, and then we're going to take a short break. Thank you. This honorable court will take a brief recess. All right.
judges: Robert B. King, James Andrew Wynn, A. Marvin Quattlebaum Jr.